UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DANIEL A. CARSTETTER,          :     CIVIL NO. 1:06-CV-1993
                               :
            Plaintiff          :     (Judge Conner)
                               :
        v.                     :     (Magistrate Judge Smyser)
                               :
ADAMS COUNTY TRANSIT AUTHORITY :
and YORK COUNTY TRANSIT        :
AUTHORITY,                     :
            Defendants         :

**REPORT AND RECOMMENDATION**

I. Background and Procedural History.


On October 10, 2006, the plaintiff, Daniel Carstetter, commenced this action by filing a complaint. On June 20, 2007, the plaintiff filed an amended complaint. The amended complaint names as defendants the Adams County Transit Authority (ACTA) and the York County Transit Authority (YCTA).


The plaintiff alleges the following in the amended complaint. The plaintiff suffers from diabetes and sleep apnea. He was employed by the defendants as a preventative maintenance mechanic and his duties included maintaining vehicles, dispatching and a limited amount of driving commercial vehicles. In May of 2005, the plaintiff saw a

company doctor to renew his medical clearance, which was set to expire on June 11, 2005, to drive certain commercial vehicles. The company doctor refused to clear the plaintiff to drive certain commercial vehicles unless and until the plaintiff would consult a pulmonary specialist.  The plaintiff informed his supervisor that the earliest appointment that he could obtain with a specialist was July of 2005.

According to company policy, once his medical clearance expired, the plaintiff could be taken off the schedule until he was able to renew his clearance.  The plaintiff requested but was denied the opportunity to obtain a second opinion with regard to the company doctor's refusal to provide a medical clearance at that time, and the plaintiff's supervisor gave him until June 24, 2005 to obtain the medical clearance before he would be taken off the schedule pending a renewal of medical clearance.

On June 20, 2005, the plaintiff requested information and forms pursuant to the Family and Medical Leave Act (FMLA) in anticipation that he might have to take a medical leave of absence until he could obtain his medical clearance.  The plaintiff's supervisor informed him that the defendants did not

have to comply with the FMLA and that he was not eligible under
the FMLA.  On June 22, 2005, the plaintiff's supervisor
informed him that she had advertised his position in the
newspaper.

On June 23, 2005, the plaintiff filed a claim for
unemployment compensation to cover the time during which he
might need to take a leave of absence pending his visit to a
pulmonary specialist and pending the renewal of his medical
clearance.  Shortly thereafter the plaintiff's employment was
terminated and his health insurance was cancelled.

The plaintiff alleges that his employment was
terminated due to his disabilities and his request to exercise
his rights under the FMLA and/or because he filed a claim for
unemployment compensation benefits.

The amended complaint contains nine counts.  Count I
contains claims under the Americans with Disabilities Act
(ADA).  Count II contains claims under the FMLA.  Count III
contains a discrimination claim under the Pennsylvania Human
Relations Act (PHRA).  Count IV contains claims under the
Rehabilitation Act (RA).  Count V is a wrongful discharge claim

under Pennsylvania law.  Count VI contains 42 U.S.C. § 1983 claims.  Count VII contains claims for violation of the Consolidated Omnibus Budget Reconciliation Act (COBRA).  Count VIII is a breach of contract claim against defendant YCTA. Count IX contains a breach of contract claim and a claim under Pennsylvania's Wage Payment and Collection Law (WPCL).

On July 5, 2007, defendant ACTA filed an answer to the amended complaint.  Also on July 5, 2007, defendant YCTA filed an answer to the amended complaint.

This case is on Judge Conner's June 2008 trial list.

In this Report and Recommendation[1], we address the following three pending motions: 1) defendant YCTA's motion (doc. 44) to dismiss for lack of subject matter jurisdiction and motion for summary judgment; 2) defendant ACTA's motion (doc. 46) for summary judgment; and 3) the plaintiff's motion (doc. 49) for partial summary judgment.

---

[1] In separate orders, we address a number of other motions.

4

II. Defendant YCTA's Motion to Dismiss for Lack of Subject-
    Matter Jurisdiction.

        Defendant YCTA contends that this court lacks subject-
matter jurisdiction over the plaintiff's claims against it
because it was not the plaintiff's employer.

        It is the nature of the claim viewed in relationship to
asserted causes of action that is the focal consideration in
determining subject-matter jurisdiction, not the accuracy of
the factual averments and not whether the complaint states a
claim upon which relief can be granted.  "[T]he absence of a
valid (as opposed to arguable) cause of action does not
implicate subject-matter jurisdiction, *i.e.*, the court's
statutory or constitutional *power* to adjudicate the case."
*Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 89
(1998)(emphasis in original).  Subject-matter jurisdiction is
not defeated by the possibility that the averments of the
complaint might fail to state a cause of action on which the
plaintiff could actually recover. *Id.*  "Dismissal for lack of
subject-matter jurisdiction because of the inadequacy of the
federal claim is proper only when the claim is 'so
insubstantial, implausible, foreclosed by prior decisions of
this Court, or otherwise completely devoid of merit as not to

involve a federal controversy.'" *Id.* (quoting *Oneida Indian Nation of N.Y. v. County of Oneida,* 414 U.S. 661, 666 (1974)).

The claims in Counts 1, 2, 3, 4, 6 and 7 of the amended complaint are claims based upon or brought pursuant to federal statutes.  Pursuant to 28 U.S.C. § 1331, this court has subject-matter jurisdiction over those claims.  The claims in Counts 5, 8 and 9 of the amended complaint are state law claims that are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  Pursuant to 28 U.S.C. § 1367(a), this court has supplemental subject-matter jurisdiction over those claims.

The plaintiff's argument that YCTA was its employer along with ACTA is not so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.  Whether or not defendant YCTA was the plaintiff's employer is an issue related to the merits of some of the plaintiff's claims.  However, it is not an issue that affects the subject-matter jurisdiction of the court. *See generally Arbaugh v. Y & H Corp.,* 546 U.S. 500, 516 (2006)(holding that

whether a defendant meets Title VII's definition of employer because it employees fifteen or more employees is an element of the plaintiff's claim and not a jurisdictional issue).

Defendant YCTA also contends that the court lacks subject-matter jurisdiction over the plaintiff's ADA, PHRA and RA claims because the plaintiff did not exhaust administrative remedies against YCTA with respect to those claims.  However, a plaintiff's failure to exhaust administrative remedies does not affect the court's subject-matter jurisdiction.  See *Wilson v. MVM, Inc.*, 475 F.3d 166, 175 (3d Cir. 2007)(holding that Title VII's exhaustion of administrative remedies requirement, applicable to claims under § 501 of the RA, are prudential and do not affect the court's subject-matter jurisdiction).

It will be recommended that defendant YCTA's motion to dismiss for lack of subject-matter jurisdiction be denied.

Defendant YCTA also argues the plaintiff's breach of contract claim against it should be dismissed and that the plaintiff's other claims against it should be dismissed because the plaintiff can not establish a prima facie case with respect

7

to those claims.[2]  Based on the way defendant YCTA's brief is structured, it is not entirely clear whether defendant YCTA's contention is that the court lacks subject-matter jurisdiction over these claims or that it is entitled to summary judgment on these claims.  The court does not lack subject-matter jurisdiction over the claims.  We will address the breach of contract claim under the summary judgment rubric and we will address the plaintiff's other claims in connection with the arguments made by defendant ACTA in connection with its motion for summary judgment and in connection with the arguments made by the plaintiff in connection with his motion for partial summary judgment.

III. Summary Judgment Motions.

        A. Summary Judgment Standard.

        Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

_____

    [2] Defendant YCTA does not set forth an argument for why the plaintiff's claims other than his breach of contract claim should be dismissed except to incorporate the arguments made by defendant ACTA in its motion for summary judgment.

that the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c).  The moving party bears the initial
responsibility of informing the court of the basis for its
motion and identifying those portions of the record which
demonstrate the absence of a genuine issue of material fact.
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving
party may discharge that burden by "'showing'-- that is,
pointing out to the district court -- that there is an absence
of evidence to support the nonmoving party's case." *Id.* at 325.
Once the moving party has met its burden, the nonmoving party
may not rest upon the mere allegations or denials of its
pleading; rather, the nonmoving party must "set out specific
facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e).

An issue of fact is "'genuine' only if a reasonable
jury, considering the evidence presented, could find for the
non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d
Cir. 1988) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 249 (1986)).  A material factual dispute is a dispute as
to a factual issue that will affect the outcome of the trial
under governing law.  *Anderson*, *supra*, 477 U.S. at 248.  In
determining whether an issue of material fact exists, the court
must consider all evidence in the light most favorable to the

9

non-moving party.  *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, supra*, 477 U.S. at 322.  "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex, supra*, 477 U.S. at 323).

B. Undisputed Facts.

The following facts are not in dispute for purposes of the pending motions for summary judgment.[3]

_____

[3] In connection with the various claims, we discuss other facts which are subject to dispute keeping in mind that the court must consider the evidence in the light most favorable to

(continued...)

*Relationship of ACTA and YCTA.*

YCTA is a municipal authority that provides public transportation services. *Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at ¶1 and *Defendant ACTA's Response to Plaintiff's Statement of Facts (doc. 73)* at ¶1.[4]  YCTA also does business under the name rabbittransit. *Id.*  YCTA employed more than 50 employees during 2004, 2005 and 2006. *Id.*

ACTA is a municipal authority that provides paratransit services. *Id.* at ¶2.

In 1996, YCTA and ACTA entered into an agreement entitled Independent Contractors Agreement (ICA). *Id.* at ¶3. *Doc. 45, Exhibit L.*

---

[3](...continued)
the non-moving party with respect to a particular claim.

[4] YCTA adopted Defendant ACTA's Response to Plaintiff's Statement of Facts. *See Doc. 76.*

11

The ICA provides that "ACTA desires to engage the YCTA as contract manager to assist in providing public transportation for the ACTA and to render certain technical advice and assistance in connection with such undertakings of the ACTA," that "ACTA has determined that the YCTA possesses the specialized, professional skills necessary to fulfill the contractual responsibilities," and that "the YCTA has the expertise to manage the ACTA's public transportation system in an efficient manner so as to provide public transportation to the extent needed and feasible for the benefit of the residents of Adams County." *Doc. 45, Exhibit L.*

For a monthly fee, YCTA agreed in the ICA "to manage the existing public transportation system in Adams County and, to the extent needed and feasible, when approved by the Board of Directors of the ACTA, expand the public transportation services throughout Adams County, Pennsylvania." *Id.* at ¶2(a). More specifically, YCTA agreed to "[p]rovide all management services, including but not limited to the oversight of vehicle operations, schedule preparation, equipment and facility maintenance, employee relations, accounting, data collection, employee selection, training, marketing, public relations, risk management, insurance procurement and maintenance, claims

12

adjusting, procurement of goods and services, service planing, and any other management services necessary for the operation of a public transportation system." *Id.* at ¶3(c).  YCTA also agreed to "[o]versee all of the administrative components of the ACTA's public transportation system, including: staffing, grant application preparation, budgeting, accounting, bid preparation (but not award), project design and construction, report preparation, program modifications and grant closeouts, subject to ACTA review and approval." *Id.* at ¶3(d).  YCTA further agreed to "[a]dminister the program in compliance with all Federal, State and Local requirements." *Id.* at ¶3(h).  The ICA also provides that "YCTA will manage the ACTA's public transportation system in keeping with the policies established by the ACTA, including (but not limited to) the ACTA's policies with respect to fares and other charges, standards of service, levels of service including frequency and location of service, personnel policies and purchasing procedures." *Id.* at ¶6.

The ICA provides *inter alia* that vehicles, equipment, facilities and other physical assets owned or acquired by ACTA shall be and remain the sole property of ACTA. *Id.* at ¶7.

A section the ICA entitled "Employees" provides:

13

> The YCTA shall furnish the ACTA with one (1) full-time employee in Gettysburg to supervise the operation of ACTA services and the services, as needed, of YCTA administrative staff based in York.  All other employees, including but not limited to, dispatchers, schedulers, office staff, and/or operators and mechanics, required to operate the public transportation system shall be employees of the ACTA.  Compensation of employees of the ACTA shall not be included in the fee arrangements included in this Agreement and shall be budgeted as an operational cost of the ACTA.  Management staff of the YCTA charged with supervising ACTA operations shall have the authority to hire, evaluate, discipline and discharge ACTA employees in accordance with established personnel policies and procedures of the ACTA.

*Id.* at ¶9.

The ICA further provides *inter alia* that "YCTA shall at all times during the term of this Agreement maintain adequate liability, property, workers compensation and employee bonding insurance for the protection of the ACTA," that ACTA agrees that YCTA shall be named as an additional named insured on all policies, that the "costs of all insurances relating to the operation of the ACTA's public transportation system, such as workers compensation insurance for dispatchers, schedulers, operators and mechanics; vehicle insurance; and general liability insurance shall be a cost of operation of the public transportation system and paid by the ACTA," and that

14

"insurances for the YCTA's management and administrative staff and functions shall be included within YCTA's fees." *Id.* at ¶14.

A section of the ICA titled "Relationship of the Parties" provides:

> The YCTA is an independent contractor. [E]xcept as otherwise specifically provided in this Agreement, it shall have the right to hire, supervise and discharge its employees and determine their compensation. The YCTA shall be solely responsible for compensating its employees, including compliance with Social Security requirements, withholding and other related matters.

*Id.* at ¶15.

An indemnity provision of the ICA provides:

> The YCTA agrees to indemnity, defend and hold harmless the ACTA against any and all claims, losses, damages or liabilities, joint and several, to which the ACTA may become subject, insofar as such losses, claims, damages or liabilities, (or actions in respect thereof) arise out of the YCTA's management and administrative services under this Agreement of the YCTA's operation of the ACTA's public transportation system or are based upon any other alleged act or omission in connection with the YCTA's administration, management and operations of the ACTA's public transportation system unless the losses, damages or liabilities arise from the YCTA following express written directions of policies of the ACTA.

*Id.* at ¶20.  More specifically, YCTA agreed to indemnify ACTA for *inter alia* "[a]ny alleged discriminatory practices, unless such alleged practices are judicially determined to have occurred at the sole discretion of the ACTA or were done according to express written policies of the ACTA." *Id.*  The ICA further provides that "[i]n the event any action or proceeding is brought against the YCTA, for which the ACTA is or may be liable, the YCTA shall promptly notify the ACTA which shall be responsible to undertake the defense of and indemnify the YCTA in connection therewith." *Id.*

In 1997, the Board of Directors of each of the defendants entered a resolution indicating that the original ICA did not cover the generation of payroll checks, payroll accounting, accounts receivable, generation of statements and other services, that in the interest of timely management decision making it would be advantageous for YCTA to take over these functions on behalf of ACTA and that an amendment to the ICA is authorized whereby YCTA will assume all financial reporting responsibilities for an additional sum. *Doc. 56, Exhibit N.*

16

The ICA has been renewed every year. *Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at ¶8 and *Defendant ACTA's Response to Plaintiff's Statement of Facts (doc. 73)* at ¶8.

YCTA's organizational charts dated 2004 to the present identify the Executive Director (ED) as reporting directly to the Board of Directors. *Id.* at ¶10.  In turn, those charts identify the Adams County General Manager (GM) as reporting directly to the ED and in a parallel reporting relationship with the Controller. *Id.*  Similarly, ACTA's organizational chart identifies the ED in a direct reporting relationship to the Board of Directors. *Id.* at ¶11.  In turn, reporting to the ED is the GM, as well as the "Controller & other YCTA support Staff." *Id.*

The ED is paid and provided benefits by YCTA out of YCTA's budget. *Id.* at ¶12.  The individual holding the ED position currently and during relevant times is Richard Farr, who was hired by YCTA on February 15, 2004. *Id.* at ¶14.  ED Farr is responsible for *inter alia* preparing grant requests and assisting YCTA's senior staff as needed. *Id.* at ¶15.  ED Farr also prepares grant requests and assists YCTA's senior staff as

17

needed for ACTA. *Id.* at ¶16.  ED Farr signs grant agreements on behalf of ACTA. *Id.* at ¶79.  ED Farr and YCTA's controller are also authorized to "provide such assurances and enter into such agreements" as necessary to ensure state and federal financial assistance to ACTA. *Id.* at ¶80.

ED Farr also serves as an alternate on the Adams County Transportation Planning Organization. *Id.* at ¶17.  YCTA's Board of Directors provides ED Farr with direction as to how to perform his duties, and he attends every YCTA Board meeting. *Id.* at ¶ 18.  ED Farr also reports to the ACTA Board on things such as grant-writing and government affairs activities, and he attempts to attend every ACTA Board meeting. *Id.* at ¶19.  The YCTA Board is responsible for appraising the ED's performance. *Id.* at ¶20.

The GM responsible for managing employees at the ACTA facility and overseeing ACTA's day-to-day operations is also a YCTA employee hired by YCTA. *Id.* at ¶22.  The GM is responsible for ACTA's employment practices, human resource functions and job advertising. *Id.* at ¶30.  In practice, the GM is responsible for the day-to-day activities of ACTA including the structure of the actual ACTA Board meetings. *Id.* at ¶29; *Farr*

*Dep. (doc. 56, Exhibit R)* at 62.   All ACTA employees report to the GM.   *Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at ¶37 and *Defendant ACTA's Response to Plaintiff's Statement of Facts (doc. 73)* at ¶37.   ACTA employees are hired and fired by the GM without ACTA Board approval. *Id.* at ¶63. In addition, the GM approves, and at times enters, ACTA's payroll. *Id.* at ¶31.

Like the ED, the GM serves on the Adams County Transportation Planning Organization. *Id.* at ¶27.   The GM is also ACTA's official representative in the Susquehanna Regional Transportation Partnership and is authorized to act on behalf of ACTA in all official Susquehanna Regional Transportation Partnership business, with the ED as an alternate such representative. *Id.* at ¶38l.   Although employed by YCTA, the GM is considered an ACTA employee and the current GM was designated by ACTA as its corporate designee during depositions in this action. *Id.* at ¶33 & ¶39.

The GM during most of the plaintiff's employment was Charmaine Wise. *Defendant ACTA's Statement of Facts (doc. 64)* at ¶13 and *Plaintiff's Counterstatement of Material Facts in Opposition to Motion for Summary Judgment (doc. 69)* at ¶13.

ACTA's Board has no role in training the ED or GM. *Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at ¶75 and *Defendant ACTA's Response to Plaintiff's Statement of Facts (doc. 73)* at ¶75.

The organizational charts of both YCTA and ACTA also identify a Controller. *Id.* at ¶40.  The individual holding this position currently and during relevant times is Bonnie Stine, a YCTA employee. *Id.* at ¶41.  ACTA's Board minutes refer to Ms. Stine as "Controller" and indicate that she routinely provided financial reports to ACTA's Board during relevant times. *Id.* at ¶45.

Frances Weishaar is and was during all relevant times ACTA's Administrative Coordinator responsible for *inter alia* processing employee requests for time off, monitoring employee leave, handling time cards, making certain payments as directed by the Controller, recording deposits and disbursements for the Controller, and other duties as assigned by the GM, the Controller or the ED. *Id.* at ¶48.  The Administrative Coordinator reports to the GM and Controller. *Id.* at ¶49.  Ms. Weishaar has served as ACTA's interim GM at numerous intervals. *Id.* at ¶50.

Members of YCTA's senior staff can be called upon for assistance by the GM. *Id.* at ¶55.  For example, YCTA staff have posted and sold vehicles titled to ACTA on Ebay. *Id.* at ¶59.

YCTA employee Kristen Heisey, who served as York's Assistant Executive Director/Customer Service & Development Coordinator during relevant times, signed the checks by which ACTA paid YCTA under the management agreement. *Id.* at ¶58.

Since at least 2002, YCTA's Controller, Operations Manager, ED and/or Assistant ED have been authorized to handle ACTA's finances, including banking and payroll. *Id.* at ¶82. August 2002 certified banking resolutions, which name York managers Dwight Huntingdon and Kristen Heisey as authorized signers on ACTA's Line of Credit, Capital Reserve, General Checking and other accounts with the Bank of Hanover, identify Mr. Huntingdon as an officer of ACTA with the title of "Service Quality Coordinator," and identify Ms. Heisey as ACTA's Customer Service & Development Coordinator. *Id.* at ¶83.  In March of 2003, ED Farr, Mr. Huntingdon and Ms. Heisey signed a document providing that the Bank was authorized to recognize them as joint depositors on at least one of ACTA's accounts. *Id.* at ¶84.  Additionally, in February of 2005, ED Farr, Mr.

Huntingdon and Ms. Heisey were authorized *inter alia* to "endorse, negotiate, and receive, or authorize the payment of the proceeds of any negotiable or other instruments or orders for the payment of money payable or belonging to ACTA" with the Bank of Hanover, pursuant to a certified banking resolution that provided, in relevant part, that these individuals were officers of ACTA. *Id.* at ¶85.  ED Farr and Mr. Huntingdon sign ACTA employee paychecks including paychecks of the plaintiff. *Id.* at ¶86.

ACTA is identified as a subgroup of YCTA for purposes of employee health benefits in which the plaintiff participated. *Id.* at ¶91.

*Plaintiff's Employment.*

Plaintiff worked as a preventative maintenance mechanic at the ACTA facility in Gettysburg, Pennsylvania beginning in June 1998. *Id.* at ¶118.  In that capacity, he was responsible for *inter alia* performing preventative maintenance (but not major repairs) on and washing company vehicles, maintaining the Gettysburg facility building and grounds, coordinating appointments with YCTA's Maintenance Coordinator or local

service stations for certain repairs, maintaining maintenance records, starting scheduled vehicles (particularly during cold months) and other duties as determined by the ED, GM and/or Maintenance Coordinator. *Id.*

The plaintiff suffers from a number of medical conditions including diabetes, hypertension, peripheral neuropathy, asthma and cardiovascular problems. *Defendant ACTA's Statement of Facts (doc. 64) at ¶27 and Plaintiff's Counterstatement of Material Facts in Opposition to Motion for Summary Judgment (doc. 69) at ¶27.* In or about February of 2005, the plaintiff was diagnosed with sleep apnea. *Plaintiff's Statement of Undisputed Material Facts (doc. 51) at ¶126 and Defendant ACTA's Response to Plaintiff's Statement of Facts (doc. 73) at ¶126.*

The plaintiff's sleep apnea constituted a new ailment in 2005 and additional documentation from a pulmonary specialist was required in order for him to obtain his Department of Transportation (DOT) medical clearance. *Defendant ACTA's Statement of Facts (doc. 64) at ¶28 and Plaintiff's Counterstatement of Material Facts in Opposition to Motion for Summary Judgment (doc. 69) at ¶28.* In or about early June

2005, the plaintiff's medical clearance required to renew his DOT physical card (required for anyone driving with certain types of commercial driver's licenses) was put "on hold" pending the plaintiff's visit to a pulmonary specialist regarding his sleep apnea. *Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at ¶127 and *Defendant ACTA's Response to Plaintiff's Statement of Facts (doc. 73)* at ¶127.  In past years, the plaintiff's medical clearance similarly was put on hold for various reasons, and each time he eventually passed and obtained his current DOT physical card. *Id.* at ¶128.

On June 11, 2005, while his medical clearance was still on hold, the plaintiff's then-current DOT physical card expired. *Id.* at ¶129.  Thereafter, the plaintiff requested leave. *Id.* at ¶130.  Specifically, on June 20, 2005, the plaintiff gave Ms. Weishaar a memo requesting forms for "Family Medical leave" and short-term disability. *Id.* at ¶131[5].  Ms. Weishaar placed the memo on GM Wise's desk the same day. *Id.* at ¶132 and *Weishaar Dep. (doc. 47, Exhibit I)* at 27.  In response, GM Wise gave the plaintiff only until June 25, 2005

---

[5] Although defendant ACTA denied the statement in this paragraph, it has not cited any evidence to dispute that the plaintiff gave Weishaar the memo.  Accordingly, we consider the statement in this paragraph not to be in dispute.

to obtain his CDL without having to utilize his accrued paid leave, and informed the plaintiff that she would begin looking for a replacement for his position. *Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at ¶133 and *Defendant ACTA's Response to Plaintiff's Statement of Facts (doc. 73)* at ¶133.  More specifically, by a letter to the plaintiff dated June 20, 2005 Wise stated:

> On Wednesday, June 8, 2005, we discussed your medical condition, which disqualified you from passing your DOT physical.  At that time, you informed me you had been diagnosed with sleep apnea in February and got a machine to assist your breathing during sleep in the beginning of March.  This condition has prevented you from obtaining your DOT Physical Certification.  As I stated, you must qualify for your DOT physical within two weeks of your current certification expiration on June 11, 2005, which is June 25, 2005.
>
> I asked if you would be able to qualify at that time; you stated that you could not pass the tests with machine use because you could not wear the mask to sleep.  You said you were only using it on weekends because you could not get used to it.  I told you that we could not allow another extension beyond that time because we had been granting extensions every year for you to qualify for the DOT certification.  When you were unable to qualify for your annual DOT certification in 2003, I told you we could not allow you to continue working every year without your DOT certification since we had to grant extensions every year.  At that time, I stated that this was the last time we would grant any extensions for you to become DOT Certified as

25

a result of your blood sugar and hypertension
issues.

However, since this condition has been
diagnosed only this year, we allowed an
extension until June 25, 2005.  You must make
every effort to qualify for your DOT physical
and become physically certified by that date.
Failing to do so means you do not meet the
requirements of your position.  Since it seems
no positive progress has been made in your
condition, we must begin searching for a
replacement for your position.  As a small
organization, we cannot afford to postpone the
search for this key position any longer.

We are extremely sorry you believe you cannot
meet the requirements of your position by June
25.  Please inform us if there is any progress
made this week.  If you have any questions, or
if I can be of any further assistance, please
feel free to see me.

*Doc.* 47, *Exhibit L.*

On June 21, 2005, the plaintiff gave GM Wise a memo
requesting additional time to obtain his certification.
*Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at
¶134 and *Defendant ACTA's Response to Plaintiff's Statement of
Facts (doc. 73)* at ¶134.  On that date, the plaintiff also
submitted leave forms requesting to use paid vacation and
personal time for all hours that he was scheduled to work from
June 22, 2005 through June 24, 2005, and thereafter to use all
of his remaining accrued vacation, personal and sick benefits.
*Id.* at ¶135.  GM Wise initially approved the plaintiff's use of

26

vacation, personal and sick time. *Id.* at ¶136.  GM Wise

acknowledged that, at the time, the plaintiff's leave was

believed to be temporary. *Id.* at ¶137.  GM Wise informed Ms.

Weishaar that she was going to put the plaintiff on short-term

disability leave and gave Ms. Weishaar a leave form listing a

number of hours of sick and vacation time that the plaintiff

was to be paid "in addition to the short-term disability while

he was off to try to get his CDL." *Id.* at ¶138.

On June 23, 2005, the plaintiff applied for

unemployment compensation benefits. *Id.* at ¶139.  The plaintiff

indicated to the unemployment compensation representative who

took his statement over the telephone that he had last worked

on June 21, 2005, that he had taken a leave of absence because

he did not pass the DOT physical and that his doctor was trying

to improve his condition so that he could return to work. *Doc.

47, Exhibit T.*  An Employer Questionnaire was sent to ACTA

regarding the plaintiff's application for unemployment

compensation benefits. *Doc. 59, Exhibit VV.*  The questionnaire

was completed by GM Wise on June 29, 2005. *Id.*  In response to

a question asking whether the plaintiff had voluntarily quit or

had taken a leave of absence, Wise indicated that he had taken

a leave of absence. *Id.*  The questionnaire informs that "[f]or

UC purposes, a leave of absence is considered a voluntary quit for the period of the leave of absence." *Id.*  Wise indicated on the questionnaire that the plaintiff had applied for short term disability insurance compensation to which he is entitled and that it was her understanding that his situation would be temporary until his condition qualified him for a DOT medical certification. *Id.*  Wise also sent a separate letter dated June 29, 2005, to the unemployment compensation authorities in which she stated *inter alia* that the fact that the plaintiff applied for unemployment compensation leads her to believe that "he will not be returning to his position or is trying to get physically qualified to obtain the DOT Medical Certification required." *Id.*

In a letter dated June 30, 2005, GM Wise wrote to the plaintiff:

> During our discussion on June 21, 2005 you claimed you could not get your required DOT Certification by the deadline of June 25, but were working toward qualifying as soon as possible. Since we carry short-term disability insurance for our full time employees, I filled out the appropriate form for you to submit a claim for Short Term Compensation. Since that time, I have received claim forms dated June 19, 2005 from the PA Unemployment Compensation [Program].  This action leaves me no other choice but to believe you never intended to try to obtain your DOT medical

> certification and wish to resign your position
> with us.

*Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at

¶144 and *Defendant ACTA's Response to Plaintiff's Statement of*

*Facts (doc. 73)* at ¶144.  GM Wise's June 30, 2005 letter to the

plaintiff further promised that the plaintiff would "be

compensated for any remaining earned vacation and personal time

on July 15" and informed Plaintiff that his health insurance

benefits were canceled as of June 30, 2005. *Id.* at ¶146.


The plaintiff never told anyone, including GM Wise,

that he was quitting. *Id.* at ¶145.  On July 1, 2005, the

plaintiff explained to GM Wise that he had not resigned. *Id.* at

¶147.


On July 15, 2005, the plaintiff filed an application

for social security disability insurance benefits. *See Doc. 47,*

*Exhibit CC.*  His claim was initially denied, but on March 15,

2006, an Administrative Law Judge granted the plaintiff's

application for benefits, finding the plaintiff to be disabled

with his disability beginning on June 21, 2005. *Id.*

29

The plaintiff had worked as a preventative maintenance mechanic for at least twelve months as of the time that his employment ended in June 2005. *Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at ¶120 and *Defendant ACTA's Response to Plaintiff's Statement of Facts (doc. 73)* at ¶120.  The plaintiff had worked a total of at least 1250 hours in the twelve months prior to the cessation of his employment as a preventative maintenance mechanic in June 2005. *Id.* at ¶121.

Charmaine Wise died in August of 2006. *Defendant ACTA's Statement of Facts (doc. 64)* at ¶14 and *Plaintiff's Counterstatement of Material Facts in Opposition to Motion for Summary Judgment (doc. 69)* at ¶14.  Prior to her death, during the course of administrative proceedings before the PHRC, Wise prepared an affidavit. *Id.* at ¶50; *Doc. 47, Exhibit M.*

The plaintiff does not currently have a completed DOT medical card. *Defendant ACTA's Statement of Facts (doc. 64)* at ¶38 and *Plaintiff's Counterstatement of Material Facts in Opposition to Motion for Summary Judgment (doc. 69)* at ¶38.

C. Third-Party Beneficiary Contract Claim.

Count VIII of the amended complaint is a breach of contract claim against defendant YCTA based on an alleged breach of the ICA between defendants YCTA and ACTA.  Defendant YCTA argues that the plaintiff can not establish a breach of contract claim because he was not a party to the ICA and because he was not a third-party beneficiary of the ICA between YCTA and ACTA.

The plaintiff contends that he was a third-party beneficiary of the ICA.

Under Pennsylvania law "a party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself . . . unless, the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give

31

the beneficiary the benefit of the promised performance."
*Scarpitti v. Weborg*, 609 A.2d 147, 150-51 (Pa. 1992).

There is nothing expressed in the ICA that indicates an intent by ACTA or YCTA to benefit the plaintiff and there are no other circumstances that indicate an intent by either ACTA or YCTA to benefit the plaintiff.  As evidence of an intent to benefit him, the plaintiff points to the provisions in the ICA by which YCTA agreed to provide management services including employee relations and hiring and evaluation of employees and by which YCTA agreed to operate ACTA's transportation system in a manner that complies with federal and state law.  These provisions, however, do not indicate an intent to benefit the plaintiff or employees in general.  Rather, these provisions merely set forth the services that YCTA agreed to provide to ACTA for the benefit of ACTA.  Although the plaintiff and other employees stood to possibly incidentally benefit from those provisions in the ICA, nothing in the ICA or any other circumstances indicates an intent of the defendants to benefit the plaintiff or employees in general.  Accordingly, defendant YCTA is entitled to summary judgment on the plaintiff's breach of contract claim against it in Count VIII of the amended complaint.

D. Judicial Estoppel.

Defendant ACTA contends that based on his position before the Social Security Administration the plaintiff is judicially estopped from raising claims under the ADA, the FMLA, the PHRA and the RA.

Judicial estoppel is an equitable doctrine, invoked by a court in its discretion, to preserve the integrity of the judicial system by preventing parties from asserting inconsistent positions in different forums. *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 121 (3d Cir. 1992). "Judicial estoppel addresses the incongruity of allowing a party to assert a position in one tribunal and the opposite in another tribunal." *Montrose Medical Group v. Bulgar*, 243 F.3d 773, 782 (3d Cir. 2001)(quoting *Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 599 (6th Cir. 1982)).  "If the second tribunal adopted the party's inconsistent position, then at least one court has probably been mislead." *Id.*

We start with the question of whether the plaintiff's ADA claims are barred by judicial estoppel. An "analysis of an

ADA claim applies equally to a PHRA claim." *Taylor v. Phoenixville School Dist.,* 184 F.3d 296, 306 (3d Cir. 1999). Accordingly, we will not separately discuss the plaintiff's PHRA claim because our analysis of that claim is coterminous with the ADA claim. *Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 751, 761 n.6 (3d Cir. 2004).  Although the ADA and the RA are not exactly the same in all respects, *see New Directions Treatment Serv. v. City of Reading,* 490 F.3d 293, 301 n.4 (3d Cir. 2007), the standards used to determine whether § 504 of the RA has been violated in a complaint alleging employment discrimination are same as the standards applied in an ADA employment-related case. 29 U.S.C. § 794(d). Thus, we do not separately address the judicial estoppel argument with respect to the RA claim.

"The Social Security Act and the ADA both help individuals with disabilities, but in different ways." *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 801 (1999).  The Social Security Act provides monetary benefits to an insured individual who "is under a disability." *Id.* (quoting 42 U.S.C. § 423(a)(1)).  The Social Security Act generally defines disability to mean an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To be considered disabled under the Social Security Act, an individual must not only be unable to do his previous work but must be unable to engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

"The ADA seeks to eliminate unwarranted discrimination against disabled individuals in order both to guarantee those individuals equal opportunity and to provide the Nation with the benefit of their consequently increased productivity." *Cleveland, supra,* 526 U.S. at 801.  The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Under the ADA, a "qualified individual with a disability" means a "an individual with a disability who, with or without reasonable accommodation, can perform the

essential functions of the employment position that such
individual holds or desires."  42 U.S.C. § 12111(8).

Despite the appearance of a conflict that arises from
the language of the two statutes, a claim under the ADA and a
social security claim are not necessarily inconsistent.
*Cleveland, supra,* 526 U.S. at 802.  The ADA defines a
"qualified individual" as a disabled person who can perform the
essential functions of the job with or without reasonable
accommodation. *Id.* at 803.  In contrast, in the social security
disability context reasonable accommodations are not taken into
account. *Id.*  "The result is that an ADA suit claiming that the
plaintiff can perform her job *with* reasonable accommodation may
well prove consistent with an SSDI [Social Security Disability
Insurance] claim that the plaintiff could not perform her own
job (or other jobs) *without* it." *Id.*  Accordingly, "pursuit,
and receipt, of SSDI benefits does not automatically estop the
recipient from pursuing an ADA claim." *Id.* at 797.  "Nor does
the law erect a strong presumption against the recipient's
success under the ADA." *Id.* at 797-98.

"Nonetheless, in some cases an earlier SSDI claim may
turn out genuinely to conflict with an ADA claim." *Id.* at 805.

36

"[A]n ADA plaintiff cannot simply ignore the apparent contradiction that arises out of an earlier SSDI total disability claim." *Id.* at 806. "Rather, she must proffer a sufficient explanation." *Id.* "When faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim." *Id.* at 807. "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential function' of her job, with or without 'reasonable accommodation.'" *Id.*

Defendant ACTA points to a form entitled "Pennsylvania Department of Public Welfare Employability Assessment Form" completed by Dr. Christopher Cannon. *Doc. 47, Exhibit Y.* Dr. Cannon checked a box on the form indicating that the plaintiff is permanently disabled. *Id.* The date on that portion of the form completed by Dr. Cannon is July 7, 2005. *Id.* Defendant ACTA contends that the statement on this form that the

plaintiff is permanently disabled is inconsistent with the plaintiff's position in this case.[6]

The plaintiff contends that his statements to the social security authorities are consistent with his claims in this case. He contends that he has the ability to perform the essential functions of his former job with some accommodation or intermittent leave. He further indicates that his medical conditions were exacerbated by his discharge and the cancellation of his medical benefits. *Plaintiff's Affidavit in Support of Opposition to Defendants' Dispositive Motions (doc. 80) at 20.* The plaintiff has presented evidence from which a

---

[6] Defendant ACTA also points to a number of other documents as inconsistent with the plaintiff's position in this case without establishing that those documents were submitted by the plaintiff in the Social Security proceedings. *See Doc. 47, Exhibits Z and AA.* Defendant ACTA also points to the plaintiff's appeal of the initial denial of social security benefits as inconsistent with the position taken by the plaintiff in this case. However, defendant ACTA has not pointed to any specific factual statements in that appeal that are allegedly inconsistent with the plaintiff's position in this case. We note that in his social security appeal the plaintiff disclosed that he had a complaint pending with the EEOC and PHRA and he also indicated that his condition had changed in July, August and September of 2005. *Doc. 47, Exhibit X.* Defendant ACTA further points to the decision of the Social Security ALJ awarding the plaintiff benefits as inconsistent with the plaintiff's position in this case. However, judicial estoppel focuses on whether the plaintiff has taken inconsistent positions not on what the factfinder in the prior proceeding found.

reasonable juror could conclude that, despite his application for social security benefits, at the time of his termination he could have nonetheless performed the essential functions of his job with a reasonable accommodation.  Further, defendant ACTA has not shown how the plaintiff's position in the social security proceeding is inconsistent with his position in this case with respect to his FMLA claims.  Accordingly, defendant ACTA is not entitled to summary judgment on the basis of judicial estoppel on the plaintiff's ADA, PHRA, RA and FMLA claims.

E. RA Claims.

Defendant ACTA contends that the RA does not apply to it because it does not participate in any contracts with the federal government.

The RA contains three main sections - Section 501, Section 503 and Section 504.

"Section 501 of the RA allows recovery of monetary damages by employees of the federal government who have suffered disability discrimination." *Wilson v. MVM, Inc.,* 475

F.3d 166, 172 (3d Cir. 2007).  The plaintiff was not an employee of the federal government.  Therefore, Section 501 is not applicable in this case.

Section 503 requires "federal contractors to take affirmative action to employ and advance in employment qualified persons with disabilities." *Bowers v. National Collegiate Athletic Ass'n,* 346 F.3d 402, 432 (3d Cir. 2003). More specifically, Section 503 provides that "[a]ny contract in excess of $10,000 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that the party contracting with the United States shall take affirmative action to employ and advance in employment qualified individuals with disabilities." 29 U.S.C. § 793(a).  Section 503 further provides that "[i]f any individual with a disability believes any contractor has failed or refused to comply with the provisions of a contract with the United States, relating to employment of individuals with disabilities, such individual may file a complaint with the Department of Labor." 29 U.S.C. § 793(b).  The Department of Labor is required to promptly investigate such a complaint and take such action as is warranted. *Id.*

"[S]ection 504 prohibits any program or activity receiving federal funds from discriminating against persons with disabilities." *Bowers, supra,* 346 F.3d at 432.  More specifically, Section 504 provides that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a).  Section 504 defines the term "program or activity" to include *inter alia* "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or a local government." 29 U.S.C. § 794(b).  Section 504 further provides that the standards used to determine whether that section has been violated in a complaint alleging employment discrimination are the standards applied in a ADA employment-related case. 29 U.S.C. § 794(d). The remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 are available to a person aggrieved by any act or failure to act by a recipient of federal assistance under Section 504. 29 U.S.C. §794a(a)(2).

41

The amended complaint cites both Section 503 and Section 504 of the RA.  However, the plaintiff has not presented any evidence that either defendant ACTA or defendant YCTA was involved in a contract with any federal department or agency for the procurement of personal property or nonpersonal services (including construction) for the United States such that the defendants would be subject to Section 503 of the RA.[7] Accordingly, it will be recommended that the defendants be granted summary judgment on the plaintiff's Section 503 RA claim.

The plaintiff has, however, presented evidence that ACTA received federal grants. *See Doc. 77, Exhibit 1* and *Doc. 57, Exhibit X.*  Accordingly, the plaintiff has presented evidence that Section 504 is applicable to defendant ACTA.

Defendant ACTA contends that the plaintiff's RA claim should be dismissed because the plaintiff failed to exhaust administrative remedies regarding that claim.  However, there

---

[7] Moreover, no private right of action exists under Section 503. *Beam v. Sun Shipbuilding & Dry Dock Co.,* 679 F.2d 1077, 1078 (3d Cir. 1982).

is no exhaustion of administrative remedies requirement with regard to claims under Section 504 of the RA. *Freed v. Consolidated Rail Corp.,* 201 F.3d 188, 194 (3d Cir. 2000)(holding that "section 504 plaintiffs may proceed directly to court without pursuing administrative remedies").

F.   ADA, PHRA and RA Claims.

Defendant ACTA argues that it is entitled to summary judgment because the plaintiff cannot establish a prima facie case under the ADA, PHRA and RA.  Again, because the claims under the ADA, PHRA and Section 504 of the RA are similar in material respects, we address only the ADA.

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  To establish a *prima facie* case of discrimination under the ADA, the plaintiff must demonstrate that he: 1) has a disability; 2) is a qualified individual; and 3) has suffered an adverse employment decision

43

as a result of his disability. *Skerski v. Time Warner Cable Co.,* 257 F.3d 273, 278 (3d Cir. 2001). "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville School District,* 184 F.3d 296, 306 (3d Cir. 1999). An employer discriminates against a qualified individual with a disability when the employer does not make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." 42 U.S.C. §12112(b)(5)(A). "Reasonable accommodation" may include measures such as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Id.* at § 12111(9).

Defendant ACTA argues that the plaintiff can not demonstrate that he is a qualified individual under the ADA because he can not perform the essential functions of his former position.

Under the ADA, a "qualified individual with a disability" means a "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  "The EEOC regulations divide this inquiry into two parts: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position." *Turner v. Hershey Chocolate U.S.,* 440 F.3d 604, 611 (3d Cir. 2006)(citing 29 C.F.R. § 1630.2(n)).  "The determination of whether an individual with a disability is qualified is made at the time of the employment decision, and not at the time of the lawsuit." *Id.*

Defendant ACTA contends that the plaintiff was not a qualified individual under the ADA because operating commercial

vehicles, which requires having a medical certification, is an essential function of his job and he could not perform that function because he did have a medical certification.

"Essential functions" are the fundamental job duties of the employment position. 29 C.F.R. § 1630.2(n)(1). The term does not include the marginal functions of the position. *Id.* A job function may be considered essential for several reasons, including the following:

> (i) The function may be essential because the reason the position exists is to perform that function;
> (ii) the function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
> (iii) the function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform that particular function.

*Id.* at § 1630.2(n)(2).

The ADA provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).  EEOC

regulations further provide that evidence of whether a

particular function is essential include:

> (i) the employer's judgment as to which
> functions are essential;
> (ii) written job descriptions prepared before
> advertising or interviewing applicants for the
> job;
> (iii) the amount of time spent on the job
> performing the function;
> (iv) the consequences of not requiring the
> incumbent to perform the function;
> (v) the terms of a collective bargaining
> agreement;
> (vi) the work experience of past incumbents in
> the job; and/or
> (vii) the current work experience of
> incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).


Although consideration must be given to the employer's

judgment as to what functions of a job are essential and to a

written job description prepared by the employer before

advertising or interviewing applicants for the job, neither a

job description nor the employer's judgment as to whether a

function is essential is determinative of itself. *Deane v.*

*Pocono Medical Center*, 142 F.3d 138, 148 (3d Cir. 1998).

Whether a particular function is essential is a factual

determination that must be made on a case by case basis based

upon all relevant evidence. *Turner, supra,* 440 F.3d at 612.

47

The plaintiff contends that obtaining a medical certification was not an essential function of his job.  He points to evidence that a medical certificate was not required until years after he began his job and that the requirement of a medical certificate was not mentioned in the job description for a preventative maintenance mechanic until June of 2005 at the time of his discharge. *Plaintiff's Affidavit in Support of Opposition to Defendants' Dispositive Motions (doc. 80)* at ¶¶4-8.  He asserts that the ability to drive commercial vehicles on public roads (such as would require a medical certificate) was not an essential function of his position. *Id.* at ¶9.  He asserts that passenger transport was not among his responsibilities and that it is permissible to test drive vehicles on private property without a medical certificate. *Id.* at ¶¶10 & 12.  He also asserts that during a twelve-week leave of absence that he took in 2003 for surgery ACTA functioned without having to replace him, *id.* at ¶14, and that during absences he arranged for outside service agencies and/or YCTA maintenance personnel to service certain vehicles without any hardship to ACTA, *id.* at ¶15.  He further asserts that defendants' employees routinely fill in for each other when one is unavailable for medical or other reasons. *Id.* at ¶16.  The plaintiff also points to evidence that on prior occasions he

was allowed to work for various periods without an updated
medical certificate. See *Plaintiff's Statement of Undisputed
Material Facts (doc. 51)* at ¶128.  Defendant disputes some of
the evidence presented by the plaintiff.  However, considering
the evidence in the light most favorable to the plaintiff as
the non-moving party, there is a genuine factual dispute as to
the material question whether a medical certificate was an
essential function of the plaintiff's job.

Assuming *arguendo* that medical certification was an
essential element of the plaintiff's job, the plaintiff asserts
that he could have obtained a medical certificate if the
defendants would have accommodated him by giving him additional
time to obtain his medical certificate.  He asserts that he
should have been either allowed to continue to work without a
medical certificate or that he should have been granted a leave
of absence until he could have obtained a medical certificate.[8]

Defendant ACTA contends that there is no evidence that
the plaintiff requested an accommodation.  However, the

---

[8] The plaintiff also contends that the defendants failed to
engage in the interactive process required by the ADA to
determine if other reasonable accommodations were available.

plaintiff has presented evidence from which a reasonable trier
of fact could conclude that he requested leave until he could
obtain his medical certificate. *Affidavit of Daniel Carstetter
in Support of Plaintiff's Motion for Partial Summary Judgment
(doc. 54)* at ¶¶9 & 10.  Thus, we turn to the question whether
granting the plaintiff leave until he obtained a certificate
would have been a reasonable accommodation.

    Whether an accommodation is reasonable is a fact
question. *Turner, supra,* 440 F.3d at 614.  In deciding whether
a genuine issue of material facts exists regarding the
reasonableness of an accommodation, we first examine whether
the plaintiff has made a facial showing that his proposed
accommodation is possible. *Id.*  If the plaintiff makes that
facial showing, the burden then shifts to the defendant to
prove, as an affirmative defense, that the accommodation
requested is unreasonable or would cause undue hardship on the
employer. *Id.*

    The plaintiff has satisfied his initial burden.  As
mentioned above, the plaintiff asserts that during a prior
leave of absence ACTA functioned without having to replace him,
that during absences he arranged for outside service agencies

and/or YCTA maintenance personnel to service certain vehicles without any hardship to ACTA, and that the defendants' employees routinely fill in for each other when one is unavailable for medical or other reasons.  The plaintiff also asserts that his position was not filled until after July 18, 2005, the date on which he had scheduled an appointment with a pulmonary specialist for completion of the form needed to obtain his medical clearance. *Plaintiff's Affidavit in Support of Opposition to Defendants' Dispositive Motions (doc. 80)* at ¶40.

The burden thus shifts to the defendant to show that the accommodation is unreasonable or would cause an undue hardship.  Defendant ACTA argues that an indefinite leave of absence would have caused it an undue hardship due to the small size of its workforce and its limited resources.  The plaintiff, however, asserts that were it not for his discharge and the concomitant cancellation of his health benefits he could have obtained a medical certificate in July of 2005. *Plaintiff's Affidavit in Support of Opposition to Defendants' Dispositive Motions (doc. 80)* at ¶19. *See also Declaration of Dr. John R. Schwartz, D.O. (Doc. 72-4)* at ¶6 ("It is my opinion that, with the proper treatment, Plaintiff could have been

cleared to return to work as preventative maintenance mechanic in July 2005."). Thus, the leave of absence would not have been indefinite. Viewing the facts in the light most favorable to the plaintiff as the non-moving party, we can not conclude as a matter of law that granting the plaintiff a limited amount of additional leave would have placed an undue hardship on the defendant.

The question of whether at the time of his discharge the plaintiff could perform the essential functions of his position with reasonable accommodation is a question of fact that must be decided at trial. Accordingly, defendant ACTA is not entitled to summary judgment on the plaintiff's ADA, PHRA and RA claims.

G. FMLA

Count II of the amended complaint contains claims under the FMLA. The plaintiff claims that the defendants violated the FMLA by failing to provide him with the requisite amount of FMLA leave, by failing to hold his job for the period during which he was entitled to leave and for subjecting him to adverse action in retaliation for requesting FMLA leave.

52

Defendant ACTA has moved for summary judgment on all of the plaintiff's FMLA claims.  The plaintiff has moved for summary judgment on his claim that he was denied the requisite amount of FMLA leave.

"The primary purposes of the FMLA are to 'balance the demands of the workplace with the needs of families' and 'to entitle employees to take reasonable leave for medical reasons.'" *Callison v. Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005).  "The FMLA endeavors to accomplish these purposes 'in a manner that accommodates the legitimate interests of employers.'" *Id.* (quoting 29 U.S.C. § 2601(b)(3)).

The FMLA "creates a series of prescriptive substantive rights for eligible employees, often referred to as the "entitlement" or "interference" provisions which set floors for employer conduct." *Id.*  Eligible employees are entitled to a total of twelve weeks of leave during any twelve-month period if the employee has a serious health condition that makes the employee unable to perform the functions of his or her position. *Id.*  Following a qualified absence, the employee is entitled to be reinstated to his or her former position or an alternative one with equivalent pay, benefits and working

53

conditions. *Id.* During FMLA leave, the employer generally must maintain coverage for the employee under any group health plan. 29 U.S.C. § 2614(c). Under certain circumstances, however, the employer may recover the group health plan premiums paid if the employee fails to return to work after the FMLA leave. *Id.*

"Additionally, the FMLA provides protection against discrimination based on the exercise of these rights, often referred to as the "discrimination" or "retaliation" provisions." *Callison, supra,* 430 F.3d at 119. "Employers may not 'use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'" *Id.* (quoting 29 C.F.R. § 825.220(c)).

Defendant ACTA contends that it is entitled to summary judgment on the plaintiff's FMLA claims because the plaintiff could not perform the essential functions of his job.

"After an eligible employee returns from an FMLA leave, the employee is entitled to be reinstated to his or her former position, or an equivalent one." *Conoshenti v. Public Serv. Elec. & Gas Co.,* 364 F.3d 135, 141 (3d Cir. 2004)(citing 29 U.S.C. § 2614(a)(1)). However, "[i]f the employee is unable to

54

perform an essential function of the position because of a
physical or mental condition, including the continuation of a
serious health condition, the employee has no right to
restoration to another position under the FMLA." 29 C.F.R.
§ 825.214(b).  The FMLA does not require "an employer to
provide a reasonable accommodation to an employee to facilitate
his return to the same or equivalent position at the conclusion
of his medical leave." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d
375, 384 (3d Cir. 2002).

        Although in order to be reinstated to a position after
taking FMLA leave an employee needs to be able to perform the
essential functions of the position, an employee does not need
to be able to perform the essential functions of the position
to be entitled to FMLA in the first place.  The FMLA was
designed to protect an employee who is unable to perform the
functions of the position from losing that position during the
leave period. *Spangler v. Federal Home Loan Bank of Des Moines,*
278 F.3d 847, 851 (8th Cir. 2002)(citing 29 C.F.R. § 825.115).
"Essentially, the leave time under the FMLA structure is an
opportunity for the employee to treat or attend to the
condition rendering her unable to perform her job." *Id.*  Hence
a determination that an employee was not qualified to perform

55

the essential functions of the position at the time of a request for FMLA leave will not automatically bar a claim that the employee was denied leave in violation of the FMLA.

Accordingly, even *assuming arguendo* that the plaintiff was not able to perform the essential functions of his job at the time he requested FMLA leave, that would not bar his claim that the defendants violated the FMLA by denying him leave under the FMLA.  Moreover, as discussed above in connection with the ADA claim, there is a genuine factual dispute about whether a medical certificate was an essential function of the plaintiff's job.

Defendant ACTA further argues that it is entitled to summary judgment on the plaintiff's FMLA claims because the plaintiff did not adequately notify ACTA of his need for FMLA leave.  However, the plaintiff has presented evidence that he requested FMLA leave.  *See Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at ¶131 and *Plaintiff's Affidavit in Support of Opposition to Defendants' Dispositive Motions (doc. 80)* at ¶32 and ¶33.  Accordingly, defendant ACTA is not entitled to summary judgment on the FMLA claims on the basis

56

that the plaintiff failed to adequately notify ACTA of his need for FMLA leave.

Defendant ACTA contends that it is entitled to summary judgment on the plaintiff's FMLA retaliation claim.

A retaliation claim under the FMLA arises under 29 U.S.C. § 2615(a)(2) which makes it unlawful for an employer "to discriminate against an employee who has taken FMLA leave." *Bearley v. Friendly Ice Cream Corp.,* 322 F.Supp.2d 563, 571 (M.D.Pa. 2004).  Retaliation claims under the FMLA are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972). *Id.*  The *McDonnell Douglas* "framework has three steps: (1) the plaintiff bears the burden of establishing a prima facie case of discrimination; (2) the burden then shifts to the defendant, who must offer a legitimate non-discriminatory reason for the action; and (3) if the defendant satisfies this burden, the plaintiff must then come forth with evidence indicating that the defendant's proffered reason is merely a pretext." *McNemar v. Disney Store, Inc.*, 91 F.3d 610, 619 (3d Cir. 1996).  To establish a prima facie case of retaliation under the FMLA, a plaintiff must show: (1) he engaged in a statutorily protected activity; (2)

he suffered an adverse employment action; and (3) a causal connection exists between the adverse action and the plaintiff's exercise of his FMLA rights. *Bearley, supra,* 322 F.Supp.2d at 571.

Defendant ACTA contends that the plaintiff has not presented evidence of a causal connection between any request for FMLA leave and the termination of his employment.

A plaintiff may rely on a "broad array of evidence" to demonstrate a causal link between his protected activity and the adverse action taken against him. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Marra v. Philadelphia Housing Auth.,* 497 F.3d 286, 302 (3d Cir. 2007) (quoting *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir. 1997)). "Conversely, however, '[t]he mere passage of time is not legally conclusive proof against retaliation.'" *Id.* (quoting *Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993). Where timing is not unusually suggestive of a causal connection standing

alone, courts may look to other evidence that gives rise to an inference of causation. *Id.*  For example, actual antagonistic conduct or animus against the employee during the intervening period may demonstrate causation. *Id.*  Also, other types of circumstantial evidence, such as inconsistent reasons given by the employer for the action or the employer's treatment of other employees may give rise to an inference of causation. *Id.* Evidence that the reason given for the adverse action was pretext may also be relevant to the issue of causation. *Weston v. Pennsylvania,* 251 F.3d 420, 432 (3d Cir. 2001).

In the instant case, the plaintiff has presented evidence that he requested FMLA leave on June 20, 2005 and that on June 30, 2005, GM Wise informed him that she considered him to have resigned his position and that his health insurance benefits were canceled as of that date. *See Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at ¶¶ 131, 144 and 146 and *Defendant ACTA's Response to Plaintiff's Statement of Facts (doc. 73)* at ¶¶131, 144 and 146.  The close temporal proximity of the plaintiff's request for FMLA leave and GM Wise's letter indicating that she considered him to have resigned his position is some evidence of a causal connection between the two events.  Moreover, as discussed below, the

59

plaintiff has presented evidence from which a reasonable factfinder could conclude that the reason given by GM Wise, that she considered the plaintiff to have voluntarily resigned, was pretext.  This evidence is also evidence from which a reasonable trier of fact could conclude that there was a causal connection between the plaintiff's request for FMLA leave and his termination.

Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  An employer satisfies its burden of production by introducing evidence which would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. *Id*.  "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id*.

In this case, defendant ACTA has articulated a legitimate nondiscriminatory reason for ending the plaintiff's

employment - that it considered the plaintiff to have voluntarily resigned his position.

Once the defendant meets its relatively light burden by articulating a legitimate reason for its action, the burden of production rebounds to the plaintiff.  To defeat summary judgment the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes*, *supra,* 32 F.3d at 764.  To avoid summary judgment, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact finder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id*. (citations omitted).  "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is 'wise,

shrewd, prudent, or competent.'" *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir. 1995).  Rather, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reasons that a reasonable fact finder could rationally find the proffered reasons unworthy of credence and infer that the employer did not act for those asserted reasons. *Fuentes*, *supra*, 32 F.3d at 765.

The plaintiff has presented evidence that he explicitly told GM Wise that he was not resigning. *See Affidavit of Daniel Carstetter in Support of Plaintiff's Motion for Partial Summary Judgment (doc. 54)* at ¶14 and *Affidavit of Dianna Marie Crook in Support of Plaintiff's Motion for Partial Summary Judgment (doc. 53)* at ¶3. *See also Affidavit of Charmaine Wise (doc. 47, Exhibit M)* at ¶27 ("He did deny that he voluntarily resigned his employment with ACTA.").  Based on the evidence presented by the plaintiff a reasonable trier of fact could conclude that defendant ACTA did not end the plaintiff's employment because it believed that he had voluntarily resigned and that the articulated reason of ACTA for ending his employment, that it believed that he had voluntarily resigned, was pretext for

discrimination. Accordingly, defendant ACTA is not entitled to summary judgment on the plaintiff's FMLA retaliation claim.

The plaintiff argues that he is entitled to summary judgment on his FMLA interference claim.  In this regard, the plaintiff contends that defendants YCTA and ACTA were his joint employers and that defendant YCTA was his primary employer.

The FMLA provides that in general the term "employer" means "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4)(A)(i).  The FMLA also provides that the term "employer" includes *inter alia* "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer" and any "public agency" as defined in the Fair Labor Standards Act of 1938. 29 U.S.C. § 2611(4)(A)(ii) & (iii). "Public agencies are covered employers without regard to the number of employees employed." 29 C.F.R. § 825.104(a).  "Normally, the legal entity which employs the employee is the employer under the FMLA." 29 C.F.R. § 825.104(c).  The term "employ" under the FMLA has the same

meaning as given that term in the Fair Labor Standards Act, 29

U.S.C. § 2611(3), and means "to suffer or permit to work." 29

C.F.R. § 825.800.


"Where two or more businesses exercise some control

over the work or working conditions of the employee, the

businesses may be joint employers under the FMLA." 29 C.F.R.

§ 825.106(a). "Joint employers may be separate and distinct

entities with separate owners, managers and facilities." *Id.*

Regulations issued by the Department of Labor provide as

follows with respect to joint employment under the FMLA:

> Where the employee performs work which
> simultaneously benefits two or more employers,
> or works for two or more employers at
> different times during the workweek, a joint
> employment relationship generally will be
> considered to exist in situations such as:
>      (1) Where there is an arrangement between
> employers to share an employee's services or
> to interchange employees;
>      (2) Where one employer acts directly or
> indirectly in the interest of the other
> employer in relation to the employee; or,
>      (3) Where the employers are not
> completely disassociated with respect to the
> employee's employment and may be deemed to
> share control of the employee, directly or
> indirectly, because one employer controls, is
> controlled by, or is under common control with
> the other employer.

*Id.*

The question is whether the entity that is claimed to be a joint employer possessed sufficient control over the work of the employee to qualify as a joint employer with the actual employer. *National Labor Relations Bd. v. Browning-Ferris Industries of PA, Inc.,* 691 F.2d 1117, 1121 (3d Cir. 1982)(analyzing joint employer issue under the National Labor Relations Act). Factors considered to determine whether an entity is a joint employer include whether the alleged employer: 1) had the power to hire and fire the employee; 2) supervised or controlled work schedules or conditions of employment; 3) determined the rate and method of payment; and 4) maintained employment records. *Johnson v. A.P. Products, LTD.,* 934 F.Supp. 625, (S.D.N.Y. 1996). The "determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its totality." 29 C.F.R. § 825.106(b). Whether an entity is a joint employer is essentially a question of fact. *Zavala v. Wal-Mart Stores, Inc.,* 393 F.Supp.2d 295, 329 (D.N.J. 2005)(analyzing issue under the Fair Labor Standards Act). *See also Browning-Ferris, supra,* 691 F.2d at 1121 (indicating that

whether entities are joint employers under the National Labor Relations Act is a factual question).

"In joint employment relationships, only the primary employer is responsible for giving required notices to its employees, providing FMLA leave, and maintenance of health benefits."  29 C.F.R. § 825.106(c). "Job restoration is the primary responsibility of the primary employer."  29 C.F.R. § 825.106(e).  The secondary employer is responsible for accepting the employee returning from FMLA leave and is also responsible for compliance with the prohibited acts provisions of the FMLA. *Id.* "The prohibited acts include prohibitions against interfering with an employee's attempt to exercise rights under the Act, or discharging or discriminating against an employee for opposing a practice which is unlawful under FMLA." *Id.* "Factors considered in determining which is the "primary" employer include authority/responsibility to hire and fire, assign/place the employee, make payroll, and provide employment benefits." 29 C.F.R. § 825.106(c).

In the instant case, many of the facts surrounding the relationship of YCTA and ACTA and the plaintiff's employment are undisputed.  For example, it is not in dispute that the

relationship between YCTA and ACTA is based on the ICA; that YCTA and ACTA have separate Boards; that the General Manager is an employee of YCTA; that the General Manager is responsible for managing employees at the ACTA facility, is responsible for ACTA's employment practices, human resource functions and job advertising and is responsible for overseeing ACTA's day-to-day operations; that all ACTA employees report to the GM; and that ACTA employees are hired and fired by the GM.  However, the parties dispute other facts relevant to the relationship between ACTA and YCTA.  They dispute YCTA's control over ACTA's payroll, whether ACTA employees report to the Executive Director of YCTA and the role of both ACTA and YCTA's Boards in the provision of employee benefits for ACTA employees. *See e.g. Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at ¶7, ¶21, ¶74, ¶90, & ¶92 and *Defendant ACTA's Response to Plaintiff's Statement of Facts (doc. 73)* at ¶7, ¶21, ¶74, ¶90, & ¶92.  Therefore, the questions whether defendant YCTA was a joint employer of the plaintiff and, if so, whether it was the plaintiff's primary employer are material questions of fact that are genuinely in dispute and that can not be resolved on this summary judgment record.

Defendant ACTA contends that the plaintiff is not entitled to summary judgment on his FMLA interference claim because the plaintiff has not established that he sought leave for treatment of a serious health condition.

The FMLA defines the term "serious health condition" to mean "an illness, injury, impairment, or physical or mental condition that involves - (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

The plaintiff has presented evidence that he sought leave under the FMLA pending treatment of his sleep apnea by a pulmonary specialist that would enable him to pass his DOT physical. *See e.g. Affidavit of Daniel Carstetter in Support of Plaintiff's Motion for Partial Summary Judgment (doc. 54)* at ¶9.  However, there is also evidence in the record from which it may be inferred that the plaintiff sought leave not to obtain continuing treatment for his sleep apnea but, rather, merely to attend an appointment with a pulmonary specialist to have the specialist complete the form he needed for his DOT physical. *See e.g. Plaintiff's Affidavit in Support of*

*Opposition to Defendants' Dispositive Motions (doc. 80)* at ¶40.
Construing this evidence in the light most favorable to the
defendants, as the non-moving parties, we can not say that the
plaintiff is entitled to judgment as a matter of law on his
FMLA interference claim based on the defendants' failure to
provide FMLA leave.

H. COBRA Claim.

Count VII of the amended complaint contains a COBRA
claim.  Both the plaintiff and the defendants have moved for
summary judgment on the COBRA claim.  For the reasons discussed
below, we conclude that neither the plaintiff nor the
defendants are entitled to summary judgment on the COBRA claim.

In 1986 Congress enacted COBRA to provide for temporary
private health insurance continuation coverage through
amendments to the Employee Retirement Income Security Act
(ERISA) and the Public Health Services Act (PHSA). *Williams v.
New Castle County,* 970 F.2d 1260, 1264 (3d Cir. 1992).  "COBRA
amended both ERISA and the PHSA by adding essentially identical
continuation coverage and notification provisions." *Id. See
also* 29 U.S.C. § 1161 *et seq.* (ERISA) and 42 U.S.C. § 300bb-1

69

*et seq.* (PHSA).  While the COBRA provisions in the PHSA and
ERISA represent parallel statutory schemes, "ERISA excludes
public employees covered by governmental employee benefit plans
. . . while the PHSA applies only to such employees." *Thomas
v. Town of Hammonton,* 351 F.3d 108, 115 (3d Cir. 2003).  "In
addition, the relief available under ERISA for violations of
COBRA notification requirements is broader than the relief
available under the PHSA for the same violations." *Id.*

Since the plaintiff was a public employee, the COBRA
provisions of the PHSA apply in this case rather than the COBRA
provisions of ERISA.

The PHSA provides:

> In accordance with regulations which the
> Secretary shall prescribe, each group health
> plan that is maintained by any State that
> receives funds under this Act, by any
> political subdivision of such a State, or by
> any agency or instrumentality of such a State
> or political subdivision, shall provide in
> accordance with this title [42 USCS §§ 300bb-1
> et seq.], that each qualified beneficiary who
> would lose coverage under the plan as a result
> of a qualifying event is entitled, under the
> plan, to elect, within the election period,
> continuation coverage under the plan.

42 U.S.C.S. § 300bb-1(a).  However, the PHSA excepts from the
above-requirement "any group health plan for any calendar year

70

if all employers maintaining such plan normally employed fewer than 20 employees on a typical business day during the preceding calendar year."  42 U.S.C.S. § 300bb-1(b).

Defendant ACTA contends that it is entitled to summary judgment on the plaintiff's COBRA claim because it employed fewer than 20 employees.  The plaintiff responds by pointing to evidence that the group health plans in which he participated were maintained by YCTA (with ACTA as a subgroup) and that YCTA employed more than 50 employees during the relevant time period. *See Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at ¶¶1, 91 & 92.  Given the evidence presented by the plaintiff, we can not say as a matter of law that defendant ACTA is entitled to summary judgment on the plaintiff's COBRA claim based on the number of employees that it employed.

The defendants assert that the plaintiff did not suffer any loss as a result of any COBRA violation.

The PHSA limits available relief for a violation of the Act to "appropriate equitable relief." 42 U.S.C. §300bb-7.

Defendants ACTA and YCTA contend that they are entitled to summary judgment because the plaintiff has not suggested any equitable relief that he would be entitled to for any violation of the COBRA amendments to the PHSA.  However, the plaintiff has suggested equitable relief that may be appropriate. *See Doc. 82* at 10-11.

The defendants further contend that the plaintiff has not suffered any loss as a result of any violation of the COBRA amendments to the PHSA because the plaintiff received social security benefits and because the plaintiff did not have any out of pocket expenses.  However, the plaintiff asserts, he did not have health insurance after he was no longer employed.  He also asserts that the fact that he received social security benefits does not warrant an inference that he was not without health insurance.  Additionally, the plaintiff asserts that he has outstanding medical bills as a result of not having health insurance after his employment ended. *See Plaintiff's Affidavit in Support of Opposition to Defendants' Dispositive Motions* at ¶ 23.

We can not say as a matter of law that defendant ACTA or defendant YCTA is entitled to summary judgment on the plaintiff's COBRA claim.

The plaintiff contends that he is entitled to summary judgment on his COBRA claim because neither YCTA nor ACTA provided him with any notification of his rights under COBRA.

The notification provisions of the COBRA amendments to the PHSA provide, in pertinent part, that: "the group health plan shall provide, at the time of commencement of coverage under the plan, written notice to each covered employee and spouse of the employee (if any) of the rights provided by . . . [42 USCS §§300bb-1 et seq.]"; that the employer of an employee under a plan must notify the plan administrator of a qualifying event under the Act within 30 days of the date of the qualifying event; and that the plan administrator shall notify any qualified beneficiary with respect to such qualifying event of the beneficiary's rights under the Act within 14 days of the date on which the plan administrator is notified of the qualifying event. 42 U.S.C.S. §300bb-6.

Although the plaintiff presents evidence that neither YCTA nor ACTA provided him with any notification of his rights under COBRA, the plaintiff does not address the issue of whether either YCTA or ACTA provided notice to the plan administrator or the issue whether the plan administrator provided the plaintiff with the notice required by COBRA. Accordingly, the plaintiff is not entitled to summary judgment on the COBRA claim.

I. 42 U.S.C. § 1983 Claims.

Count VI of the amended complaint contains claims brought pursuant to 42 U.S.C. § 1983.  The defendants have moved for summary judgment on the plaintiff's § 1983 claims.[9] For the reasons discussed below, we conclude that the defendants are entitled to summary judgment on the plaintiff's § 1983 claims.

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another

[9] As indicated previously, defendant ACTA moved for summary and defendant YCTA incorporated defendant ACTA's arguments in support of its motion for summary judgment into its motion to dismiss or for summary judgment.

individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman v. Penn Manor School Dist.,* 422 F.3d 141, 146 (3d Cir. 2005). Section 1983 "does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." *Id.*

Both defendants are municipal authorities. A municipality cannot be held liable for the unconstitutional acts of its employees on a theory of *respondeat superior.* *Monell v. Department of Social Servs.,* 436 U.S. 658, 691 (1978). Instead, "[m]unicipal liability only attaches when the 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Watson v. Abington Twp.*, 478 F.3d 144, 155 (3d Cir. 2007) (quoting *Monell, supra,* 436 U.S. at 694). "There must be a 'direct causal link between the municipal policy or custom and the alleged constitutional deprivation' to ground municipal liability." *Jiminez v. All American Rathskeller*, *Inc.,* 503 F.3d 247, 249 (3d Cir. 2007)(quoting *City of Canton v. Harris,* 489 U.S. 378, 385 (1989)).

"[T]here are two ways that a plaintiff can establish municipal liability under § 1983: policy or custom." *Watson, supra,* 478 F.3d at 155.  A plaintiff establishes that a policy existed by establishing that a decisionmaker possessing final authority to establish municipal policy with respect to the action issued an official proclamation, policy or edict. *Id.* On the other hand, a plaintiff establishes that a custom existed by establishing that a given course of conduct, although not specifically endorsed or authorized by law, was so well-settled and permanent as virtually to constitute law. *Id.* at 155-56. "In other words, custom may be established by proving knowledge of, and acquiescence to, a practice." *Id.* at 156.  The plaintiff has "the burden of showing that a government policymaker is responsible by action or acquiescence for the policy or custom." *Jiminez, supra,* 503 F.3d at 250. "[A]t a minimum, the government must act with deliberate indifference to the purported constitutional deprivation in order to ground liability." *Id.*

Under either route - policy or custom - "' a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom.'" *Id.* (quoting

*Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir. 1990)).  "In order to determine who has policymaking responsibility, 'a court must determine which official had final, unreviewable discretion to make a decision or take an action.'" *Id.* (quoting *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1481 (3d Cir. 1990)).

The plaintiff contends that the defendants had a custom, policy or practice of denying employees the right to exercise their rights under the FMLA.

Section 1983 "does not provide an avenue for relief every time a state actor violates a federal law." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005).  In order to sustain an action under § 1983 for a federal statutory violation, the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs. *Id.* at 120.  If the plaintiff makes such a showing, there is a rebuttable presumption that the applicable statutory right is enforceable under § 1983. *Id.*  This presumption is defeated if Congress did not intend for § 1983 to be available as a remedy for the statutory right. *Id.*  "[E]vidence of such congressional intent

may be found directly in the statute creating the right, or inferred from the statute's creation of a 'comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Id.* (quoting *Blessing v. Freestone,* 520 U.S. 329, 341 (1997)).  "The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983." *Id.* at 121.  The inference that the remedy provided by the statute is exclusive can "be overcome by textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983." *Id.* at 122.

The FMLA provides a comprehensive remedial framework such that enforcement of alleged FMLA violations through § 1983 is foreclosed. *Kilvitis v. County of Luzerne,* 52 F.Supp.2d 403, 419 (M.D.Pa. 1999)(Vanaskie, J.).  Accordingly, a custom, policy or practice of violating the FMLA does not support a § 1983 claim.

The plaintiff also contends that defendant ACTA had a custom and practice of refraining from taking any action to enforce the nondiscrimination provisions of the ICA or

otherwise ensuring that YCTA managed its operations in a manner that did not violate the constitutional and federally-protected rights of its employees.  In this regard, the plaintiff has not established any constitutional right of his that was violated by ACTA's inaction.  Further, similar to the policy regarding violation of the FMLA discussed above, the plaintiff can not base a § 1983 claim on a violation of the RA, the ADA, or the COBRA amendments to the PHSA. *See A.W. v. Jersey City Public Schools,* 486 F.3d 791, 806 (3d Cir. 2007)(holding that § 1983 is not available to provide a remedy for an alleged violation of Section 504 of the RA); *Holbrook v. City of Alpharetta,* 112 F.2d 1522, 1531 (11th Cir. 1997)(same with regard to the ADA); *Mansfield v. Chicago Park Dist. Group Plan,* 946 F.Supp. 586, 596 (N.D. Ill. 1996)(same with regard to claim under PHSA to vindicate COBRA rights).  Accordingly, such a custom, policy or practice does not support a § 1983 claim.

The plaintiff also contends that defendant ACTA had a custom, policy or practice of ignoring employee complaints about YCTA's management and misleading employees into believing that ACTA's Board of Directors had certain authorities with regard to their employment that the Board really did not have. However, the plaintiff has not articulated how such a custom,

policy or practice violated any constitutional or federal right of his.  Accordingly, such a custom, policy or practice does not support a § 1983 claim.

In the amended complaint, the plaintiff alleges that the defendants had a policy of treating male and female employees differently in violation of the Equal Protection Clause with regard to licensing.  Defendant ACTA contends that similarly-situated female employees were not treated differently than the plaintiff.  The plaintiff argues that two females employees were treated differently than the plaintiff because they were not fired when they could not obtain their medical certification but rather they voluntarily chose to resign.  However, the plaintiff has not presented evidence that an official who had the power to make policy was responsible for either the affirmative proclamation of a policy of treating females differently or acquiesced in a well-settled custom of doing so.  Accordingly, the plaintiff has not established that any difference in treatment of female employees and male employees was the result of a municipal policy, custom or practice.

Based on the foregoing, the defendants are entitled to summary judgment on the plaintiff's 42 U.S.C. § 1983 claims.

J. Wrongful Discharge Claim.

Count V of the amended complaint is a claim based upon an alleged wrongful discharge in violation of Pennsylvania law. The plaintiff claims that the defendants discharged him in retaliation for his efforts to obtain unemployment compensation benefits.  The plaintiff and the defendants seek summary judgment on the wrongful discharge claim.

"The at-will employment doctrine has historically provided that absent an employment contract, an employer is free to terminate an employee at any time, for any reason." *Rothrock v. Rothrock Motor Sales, Inc.,* 883 A.2d 511, 512 n.1 (Pa. 2005).  Although Pennsylvania has been consistently reluctant to erode this convention, several narrow exceptions to the at-will employment doctrine have been carved out based upon matters of public policy. *Id.*  Terminating an employee's employment because the employee had made a claim for unemployment compensation during a period when he was not

working is a violation of Pennsylvania public policy. *Highhouse v. Avery Transp.,* 660 A.2d 1374, 1378 (Pa.Super.Ct. 1995).

Defendant ACTA contends that it is entitled to summary judgment on the wrongful discharge claim because it in good faith considered the plaintiff to have voluntarily quit his position due to his failure to present evidence of a valid DOT medical card by the deadline set by Charmaine Wise, and based upon his actions in requesting payment for all remaining benefits and in filing for unemployment compensations benefits.

Defendant ACTA provided an affidavit signed by Wise on February 24, 2006, in which Wise stated that on June 27, 2005, without notice as to the plaintiff's intentions relative to obtaining his medical certification, she received notice that he had applied for unemployment compensation benefits. *Doc. 47, Exhibit M* at ¶16.  She stated that based upon the information provided and the lack of any communication on the progress toward obtaining the required medical certification, she could only assume that the plaintiff had elected to voluntarily terminate his position. *Id.*  Wise stated that the unemployment compensation information provided included information that the plaintiff could not perform job functions or any type of work

due to medical issues. *Id.* at ¶25.  Wise stated that after the plaintiff received notification that ACTA considered his employment voluntarily terminated, the plaintiff made no statements that he was attempting to obtain his medical certification. *Id.* at ¶27.  She further stated that he did deny that he voluntarily resigned his employment with ACTA and she responded by stating that if he was on medical leave he was not unemployed and that, therefore, the unemployment claim led her to believe that he no longer qualified for medical leave. *Id.*

The plaintiff contends that he is entitled to summary judgment on the wrongful discharge claim because upon receiving notification that the plaintiff applied for unemployment compensation benefits Charmaine Wise directed that the leave that had been promised to the plaintiff no longer be paid and that his employment was ended.  Francis Weishaar, ACTA's Administrative Coordinator, testified that Wise had given her a leave form with hours of sick and vacation time that was to be paid to the plaintiff in addition to his short-term disability while the plaintiff was off to try to get his CDL. *Weishaar Dep. (doc. 56, Exhibit O)* at 24.  Weishaar testified that a week or two later Wise came back and told her to go ahead and terminate the plaintiff because she received unemployment

papers and that he quit. *Id.* at 25.  The plaintiff points to
evidence that he never told Wise that he quit and that on July
1, 2005, he told GM Wise that he was not resigning. *See
Affidavit of Daniel Carstetter in Support of Plaintiff's Motion
for Partial Summary Judgment (doc. 54)* at ¶14 and *Affidavit of
Dianna Marie Crook in Support of Plaintiff's Motion for Partial
Summary Judgment (doc. 53)* at ¶3.  The plaintiff points out
that Wise did acknowledged that the plaintiff told her he was
not resigning. *See Affidavit of Charmaine Wise (doc. 47,
Exhibit M)* at ¶27 ("He did deny that he voluntarily resigned
his employment with ACTA.").  The plaintiff also points out
that on the unemployment questionnaire that was completed by GM
Wise on June 29, 2005, it indicated that "[f]or UC purposes, a
leave of absence is considered a voluntary quit for the period
of the leave of absence"; that in response to a question asking
whether the plaintiff voluntarily quit or took a leave of
absence, Wise indicated that he took a leave of absence; and
that Wise further indicated that the plaintiff had applied for
short term disability insurance compensation to which he is
entitled and that it was her understanding that his situation
would be temporary until his condition qualified him for a DOT
medical certification. *Doc. 59, Exhibit VV.*

The plaintiff has presented circumstantial evidence from which a reasonable trier of fact could find that Wise terminated the plaintiff because he filed for unemployment compensation benefits.  Defendant ACTA has presented circumstantial and direct evidence which if believed could lead a reasonable trier of fact to find that Wise believed that the plaintiff had voluntarily quit his position.  Accordingly, summary judgment should not be granted to either the plaintiff or defendant ACTA on the wrongful discharge claim.

Defendant YCTA contends that it is entitled to summary judgment on the wrongful discharge claim because it took no action with regard to the plaintiff's discharge.  However, as discussed above, there is evidence that Charmaine Wise, who was an employee of YCTA, terminated the plaintiff's employment. Thus, there is evidence that YCTA, through its agent Wise, took action with regard to the plaintiff's discharge.  Accordingly, defendant YCTA is not entitled to summary judgment on the wrongful discharge claim.

K.   Wage Payment and Collection Law Claim.

Count IX of the amended complaint contains a breach of contract claim and a claim under Pennsylvania's Wage Payment and Collection Law (WPCL) for unused vacation time.  The plaintiff and the defendants seek summary judgment on the WPCL claim.

The WPCL provides that employers shall pay wages dues to employees on regular paydays designated in advance. 43 P.S. § 260.3.  The WPCL also provides that "[w]henever an employer separates an employe from the payroll, or whenever an employe quits or resigns his employment, the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable." 43 P.S. § 260.5.  The WPCL provides for a civil action to recover wages due to an employee. 43 P.S. § 260.9a.

The defendants contend that they are entitled to summary judgment on the plaintiff's WPCL claim because the WPCL does not apply to municipal corporations.

The WPCL defines an employer subject to the Act to
include "every person, firm, partnership, association,
corporation, receiver or other officer of a court of this
Commonwealth and any agent or officer of any of the above-
mentioned classes employing any person in this Commonwealth."
43 P.S. § 260.2a.

The defendants have cited numerous cases in which
courts have held that the WPCL does not apply to municipal
corporations.  Most of the cases cited by the defendants rely
on the Commonwealth Court's decision in *Huffman v. Borough of
Millvale,* 591 A.2d 1137 (Pa.Commw.Ct. 1991).  In *Huffman,* the
Commonwealth Court held that the WPCL does not apply to a
borough.  *Id.* at 1139.  The court reasoned that boroughs were
not specifically included in the definition of employer under
the Act, that although the definition of employer under the Act
included corporations there is a distinction between municipal
corporations and private corporations, and that if the
legislature had wished to include municipal corporations in the
definition of employer under the Act it could have easily done
so.  *Id.*  Relying on the legal maxim *expressio unius est
exclusio alterius,* which is that the mention of a specific
matter in a statute implies the exclusion of others not

87

mentioned, the court concluded that the WPCL does not apply to a borough. *Id.*

In response to the defendants' argument that the WPCL does not apply to municipal corporations, the plaintiff cites an older Court of Common Pleas case which held that the WPCL applies to municipal corporations. *Gingrich v. City of Lebanon,* 32 Pa.D. & C.2d 726 (C.C.P. Lebanon Cty. 1963).  The court in *Gingrich* reasoned that there is no real difference between the legal personality of a municipal corporation and a business corporation and that the usual and commonly understood meaning of the word "corporation" includes municipal corporations. *Id.* at 728-29.

The parties have not cited and we have not found a case from the Pennsylvania Supreme Court addressing the issue whether the WPCL applies to a municipal corporation.  "Where a question of state law is unsettled, we must predict the Pennsylvania Supreme Court's resolution of the issue, giving consideration to applicable decisions of the intermediate appellate state courts." *Franklin Prescriptions, Inc. v. New York Times Co.,* 424 F.3d 336, 341 (3d Cir. 2005).

88

The WPCL includes the term "person" within its definition of an employer.  Pennsylvania's Statutory Construction Act defines the term "person" to include "a corporation, partnership, limited liability company, business trust, other association, government entity (other than the Commonwealth), estate, trust, foundation or natural person." 1 Pa.C.S.A. § 1991.  A municipal corporation is a government entity other than the Commonwealth.  Thus, whether or not a municipal corporation falls within the definition of a corporation in the Act, a municipal corporation does fall within the definition of a person in the WPCL.  According, we respectfully disagree with the holding of the court in *Huffman, supra* (and the cases relying on it) that the WPCL does not apply to municipal corporations and we predict that the Pennsylvania Supreme Court would hold that the WPCL applies to a municipal corporation.

Defendant YCTA contends that the WPCL does not apply to the instant matter because claims under the WPCL are based on a contract and YCTA had no contract with the plaintiff.  The plaintiff, however, contends that the defendants agreed through Charmaine Wise to provide the plaintiff with payment for all

accrued sick time and vacation time. *See Plaintiff's Statement of Undisputed Material Facts (doc. 51)* at ¶142 & ¶143.

Defendant ACTA contends that it is entitled to summary judgment on the WPCL claim because the plaintiff received payment for all vacation days, personal days and all the time that he worked at ACTA.  The plaintiff contends that he is entitled to summary judgment on the WPCL claim because he was not paid the amounts due him.  There is a genuine dispute about whether the plaintiff has been paid all of the monies due him.  Accordingly, summary judgment for either the plaintiff or the defendants is not appropriate.

IV. Recommendations.

Based on the foregoing, it is recommended that defendant YCTA's motion (doc. 44) to dismiss for lack of subject-matter jurisdiction and motion for summary judgment be granted in part and denied in part.  It is recommended that defendant YCTA be granted summary judgment on the plaintiff's breach of contract claim in Count VIII of the amended complaint, that defendant YCTA be granted summary judgment on the plaintiff's Section 503 RA claim and that defendant YCTA be

granted summary judgment on the plaintiff's 42 U.S.C. § 1983 claims.  It is recommended that defendant YCTA's motion be otherwise denied.

It is further recommended that defendant ACTA's motion (doc. 46) for summary judgment be granted in part and denied in part.  It is recommended that defendant ACTA be granted summary judgment on the plaintiff's Section 503 RA claim and that defendant ACTA be granted summary judgment on the plaintiff's 42 U.S.C. § 1983 claims.  It is recommended that defendant ACTA's motion for summary judgment be otherwise denied.

It is recommended that the plaintiff's motion (doc. 49) for partial summary judgment be denied.

**/s/ J. Andrew Smyser**
J. Andrew Smyser
Magistrate Judge

Dated:  February 14, 2008.